**RESERVE OIL, INC., an Oklahoma corporation, Plaintiff-Appellant,**

v.

**Frank A. DIXON and Bennett P. Blake, Defendants-Appellees.**

**and**

**PETROLEUM INVESTMENTS, LTD. 1976, Petroleum Investments, Ltd. 1976B and Petroleum Investments, Ltd. 1976S, Plaintiffs-Appellants,**

v.

**Bennett P. BLAKE and Frank A. Dixon, Jr., Defendants-Appellees.**

**Nos. 81–1375, 81–1376.**

United States Court of Appeals, Tenth Circuit.

July 13, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 22, 1983.

B.J. Rothbaum, Jr., Oklahoma City, Okl. (Drew Neville and James D. Thomas, Oklahoma City, Okl., on brief), of Linn, Helms, Kirk & Burkett, Oklahoma City, Okl., for plaintiffs-appellants.

William D. Watts, Oklahoma City, Okl. (Richard L. Bohanon, Oklahoma City, Okl.,

with him on brief), of Andrews, Davis, Legg, Bixler, Milsten & Murrah, Oklahoma City, Okl., for defendant-appellee Frank A. Dixon, Jr.

Before McWILLIAMS, BREITENSTEIN and McKAY, Circuit Judges.

McKAY, Circuit Judge.

This appeal involves disputes over the operation of two Oklahoma oil and gas wells and arises from two cases consolidated at the trial level.

The plaintiff in the first case, Reserve Oil, Inc., an Oklahoma corporation, owns a working interest in an oil and gas well known as Beisel No. 1. Defendant Pengo Petroleum, Inc., a Nevada corporation with principal offices in Texas, was the operator of the well during the relevant period. Defendants Frank Dixon and Bennett Blake are officers of Pengo. Reserve alleges that Pengo, through Dixon and Blake, sold the well's production in which Reserve had an interest and failed to turn over to Reserve its share of the proceeds of the sale. Instead, Pengo used the money to pay operating expenses and the ownership shares of the other owners of interests in the well, including Blake, Dixon, other directors of Pengo, and their friends and relatives.

Reserve sued Pengo on theories of conversion, breach of contract, and breach of fiduciary duty. Pengo has since gone into bankruptcy, and all actions against it have been stayed. Reserve also sued Dixon and Blake personally for conversion and breach of fiduciary duty.

In the second case, three Oklahoma limited partnerships—Petroleum Investments, Ltd. 1976, Petroleum Investments, Ltd. 1976B, and Petroleum Investments, Ltd. 1976S—sued Pengo. The partnerships, which owned working interests in another oil and gas well operated by Pengo, alleged various acts of misconduct by Dixon and Blake in their capacity as officers of Pengo, apparently as a basis for piercing the corporate veil in order to hold Blake and Dixon personally liable for their acts.

After consolidation, the trial court dismissed the action, holding that the operating agreements did not create fiduciary relationships between the parties and that no conversion had occurred. In reaching the latter holding, the court defined conversion as taking property without the owner's consent and stated that money can be converted if the fund from which the money is taken is a specific chattel or if there is an obligation to return specific money, but not when indebtedness can be discharged by the payment of money generally. The court construed the parties' agreements as not creating an agency relationship or any obligation to return specific money. Instead, the court stated, the indebtedness could be discharged by payment of money generally, and Pengo had no duty to separate the plaintiffs' shares of the proceeds of the sale of the oil and gas from Pengo's share.[1]

The contract vests ownership of the oil and gas produced from the wells in the parties in the same percentage that they own interests in the well. Plaintiff's Exh. 1, § 4.[2] The contract also grants the owners the right to dispose of their oil and gas as they see fit—that is, by taking it in kind or selling it themselves. Id. § 13. "In the event any party shall fail to make the arrangements necessary to ... dispose of its proportionate share of the oil and gas produced from the [well], Operator shall have the right ..., but not the obligation, to purchase such oil and gas or sell it ...." Id. The contract also provides for the sharing of the costs and expenses of operating the well. It authorizes the operator to bill the other parties in advance for their proportionate shares of the estimated costs to be incurred during the succeeding month and requires each party to pay its estimated share of costs within fifteen days from receipt of the estimate. Id. § 8. If any party fails to pay, the operator is granted a preferred lien in, inter alia, the delinquent

---

1. The court indicated in its February 11, 1981 opinion and order that the plaintiffs abandoned their attempt to pierce the corporate veil.

2. The operating agreements in both cases are identical in all material respects. We therefore cite only to the contract underlying Reserve's claims.

party's oil and gas or the proceeds from its sale. The operator is also authorized to collect the delinquent party's share of costs directly from that party's purchasers, out of the sale proceeds, up to the amount owed by that party. *Id.* § 9. The contract establishes a joint account to keep track of the costs and to credit against them the amounts paid into the fund by the owners. *See id.,* Exhibit C.

This contract does not simply create an indebtedness on the part of the operating corporation to pay to the other owners their shares of the profits from the well production. It gives the party ownership and full control over its proportionate share of the oil and gas. The operator is allowed to invade the owner's province only when the owner fails to dispose of its production proceeds, and even then the owner can revoke that power. Furthermore, if the operator exercises its right to dispose of the owner's production proceeds, the operator can take proceeds from the sale for its own use only to the extent necessary to cover the owner's unpaid proportionate share of the costs of production. The operator has no right to or interest in either the oil and gas or the proceeds from its sale beyond the owner's unpaid proportionate share of the costs. Nor do we find anything in the contract authorizing the commingling of funds.[3] We therefore hold that this contract created a trustee type relationship imposing a duty of fair dealing between the operator and the

non-operator owners in the matter of distribution of shares among the owners.[4] We do not mean to imply that there is a general agency relationship as to third parties, which of course is specifically disavowed in the contract itself.[5]

We therefore reverse and remand to the trial court for such proceedings, consistent with this opinion, that it deems necessary to resolve the remaining issues, including whether Texas or Oklahoma law applies to a particular cause of action and whether, under the appropriate state's law, corporate torts or breaches of fiduciary duties can be imputed to the corporate officers through whom the acts were committed.

3. The accounting procedures set out in the contract authorize the establishment of a joint account "showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties." Plaintiff's Exh. 1, Exhibit C § 1. The trial court construed this term as authorizing the commingling of sale proceeds in the joint account because otherwise the term "credits" would have little meaning. We disagree. We read "charges" as referring to the accruing operating costs to be shared by the owners and "credits" as referring to the owners' payments into the joint account made under the procedure for the advance billing and payment of estimated costs set out earlier in our opinion. *See ante* at 952–953.

4. Although we are simply construing the parties' contracts, we note that the Oklahoma Supreme Court has held that the operator of a

unitized oil field stands in a position similar to that of a trustee with respect to those interested in the oil production. *Young v. West Edmond Hunton Lime Unit,* 275 P.2d 304 (Okl. 1954), *appeal dismissed,* 349 U.S. 909, 75 S.Ct. 600, 99 L.Ed. 1245 (1955).

5. The liablity of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the cost of developing and operating the contract area ... it is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or render the parties liable as partners.